THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY W. MORRIS, Plaintiff in Error.

*Opinion filed June 21, 1912.*

1. MURDER—*when the proof of express malice is unnecessary.* Proof of malice, express or implied, is essential to establish a charge of murder; but malice is implied where the evidence is that the accused, while waiting with his companion for her to take a car, suddenly and without provocation or excuse shot her several times and then attempted to commit suicide.

2. SAME—*when it is not error to send blood-stained clothing of victim to jury room.* Where there is a discrepancy in the evidence as to how near the body of the victim the revolver was held and it is material to determine that question, the powder-burned clothing of the victim, in evidence in the case, may be sent to the jury room, and the fact that the clothing is blood-stained does not require that it be excluded therefrom.

3. NEW TRIAL—*proof of prejudice of juror must be clear and satisfactory.* To justify granting a new trial in a criminal case upon the ground of the prejudice of a juror the proof of such prejudice must be clear and satisfactory.

4. INSTRUCTIONS—*when accused cannot complain that instructions stating doctrine of self-defense were given.* If the accused obtains an instruction that the jury should acquit him if they believed the deceased assaulted him with a deadly weapon, he can not complain that instructions stating the doctrine of self-defense correctly were asked for and given on behalf of the prosecution.

WRIT OF ERROR to the Circuit Court of Kane county; the Hon. DUANE J. CARNES, Judge, presiding.

ALDRICH & WORCESTER, and FRED C. G. SCHMIDT, for plaintiff in error.

W. H. STEAD, Attorney General, and W. J. TYERS, State's Attorney, (J. C. MURPHY, E. L. LYON, and F. W. JOSLYN, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error was found guilty by a jury at the November term, 1911, of the circuit court of Kane county, of the murder of Estella Dumas on December 17, 1910, and sentenced to life imprisonment in the penitentiary.

Plaintiff in error was a married man, living with his wife and two children at Plano, Kendall county. He was thirty-nine years of age and was a carpenter by trade. Prior to his acquaintance with Estella Dumas he was not a hard drinker of intoxicants. In September, 1910, he made the acquaintance of deceased in a house of prostitution near Aurora. He called upon her a few times, and on December 7 they went on a trip to Ottawa, Streator and Pontiac to see about some property in which the deceased claimed to have an interest, returning a day or two later. On Sunday, December 11, he met deceased at Aurora, and they went to Chicago and remained several days, while there putting up at rooming houses and hotels. They drank freely on these trips and were more or less intoxicated much of the time. Friday morning, December 16, they returned to Aurora and in the afternoon went to Montgomery, a small town near Aurora, and stopped at the rooming house of Stahlle & Waller. They spent Friday night and Saturday at this place and drank a good deal during the time. During the day of December 17 one of the proprietors, Waller, who was acquainted with plaintiff in error, induced him to arrange to go home, and promised to accompany him on a train that would leave Montgomery

at 6:20 P. M.  Deceased decided to go to Chicago on the car which left at 6:00 P. M., and asked plaintiff in error to accompany her to the crossing, three blocks away, where she was to board the car.  They walked to the crossing, and while waiting for the car plaintiff in error shot and killed the deceased.  His arrest, conviction and sentence followed.

The errors relied on for reversal are:  (1) That the evidence shows the shooting was done under circumstances which would make the act, if a crime at all, manslaughter, and not murder;  (2) the admission of improper and exclusion of proper evidence on the trial of the case;  (3) the giving of erroneous instructions for the prosecution; and (4) that the court erred in overruling the motion for a new trial on the ground of bias of one of the jurors.

The principal question raised by the assignment of errors and discussed in the briefs and arguments is whether the evidence was sufficient to justify the conviction of the plaintiff in error of the crime of murder.  It is not denied that he shot and killed Estella Dumas at the time and place alleged, but it is contended that the killing was done under such circumstances that if it constituted any crime at all it would be manslaughter.  This contention of counsel for plaintiff in error is based upon the theory that Estella Dumas first shot plaintiff in error in the head, inflicting a scalp wound; that he wrested the revolver from her, and under the excitement, provocation and passion of the moment turned it upon and shot her.  Proof of malice, express or implied, is indispensable to sustain the charge of murder, and it is argued the proof does not show the existence of this element of the crime of murder.  If, as contended by the State, Estella Dumas made no assault upon plaintiff in error, and he shot her to death and then inflicted the wound upon himself in an attempt at suicide, malice would be implied and proof of express malice would not be required.  This is so declared by section 140 of our

254 — 36

Criminal Code, and it is unnecessary to refer to the long line of authorities upon that question.

There was no eye-witness to the homicide and no proof of any quarrel or anger between plaintiff in error and deceased before the shooting occurred. Frank Waller, one of the proprietors of the house at which plaintiff in error and Estella Dumas stayed from December 16 to the evening of December 17, had formerly resided in Plano and was well acquainted with plaintiff in error. The house was used for conducting a saloon and restaurant on the first floor, and the upper floor was occupied by bed-rooms for guests and customers. No questions were asked whether a man and woman occupying the same room were husband and wife. In fact, the second floor of the building was used as an assignation house. Waller some time during the day of December 17 advised plaintiff in error to go home, and Estella Dumas approved the advice, saying he could return the following Monday. Waller proposed to go with him to Plano on a 6:20 P. M. train. Plaintiff in error and the woman had several drinks during the day but Waller heard of no unpleasantness between them. William Roberts, bar-tender for Stahlle & Waller, testified to the parties being at their house December 16 and 17 and to serving them drinks. He testified that about fifteen minutes before six o'clock on December 17 he saw plaintiff in error, Estella Dumas and Waller together, and Waller was advising plaintiff in error to get ready to take the 6:20 train; that at the time the parties were talking and laughing and seemed very agreeable; that he served the three of them with drinks and they disappeared. Charles Lightbody met plaintiff in error and Estella Dumas about six o'clock on their way to the place where the woman was to take the car. He did not know them but said they appeared to be under the influence of liquor; that the woman had hold of the man's arm and he thought they were just taking a walk. A. J. Turco passed within ten feet of them

as they were standing in the street at the crossing of Clay and Main streets waiting for the car but did not hear them say anything. George Hurteau testified he saw a man and woman walking slowly about one hundred and fifty feet from the place where the shooting occurred; that they were on the opposite side of the street from the witness, and he did not see anything in their appearance or hear them say anything that attracted his attention. No other witness testified to seeing them after they left the house of Stahlle & Waller, before the homicide occurred. There is therefore nothing in the testimony of these witnesses to indicate that there was any anger or unfriendliness between the man and woman or on the part of either one toward the other. No one now living has any actual knowledge of the real facts of the homicide, unless it be plaintiff in error. He disappeared after the homicide, before the car which was approaching reached the place where it occurred. The motorman of the car the woman was to board for Chicago saw her body at the crossing of Main and Clay streets, lying beside the track. He stopped his car, went to the deceased and found her lying face downward. He turned her body over and says she gasped and was dead. People who were in the vicinity quickly gathered, but the plaintiff in error had disappeared and search for him was fruitless until Friday, when the officers received information from some source that he was at his home in Plano. Immediately after the homicide plaintiff in error fled to a house not far distant, which was not completed for occupancy, and concealed himself therein for some time, but left it during the same night and went some distance to a barn, climbed up into the mow and concealed himself in the hay, and remained there until Thursday night, when he left the barn and went to his home in Plano. He had a gunshot wound on the right side of his head, a cut in his neck and one on his wrist. When he learned the officers were coming to arrest him he went up into the attic of his

residence, where he was discovered by the officers. When he heard the officers coming after him he swallowed a tablet containing corrosive sublimate, with the intention of destroying his life. He was taken by the officers in an automobile to a hospital in Aurora. Dr. Brennecke attended him at the hospital, and testified he was suffering from the effects of some poison he had taken, which the doctor took to be corrosive sublimate. The doctor administered antidotes and pumped out his stomach. He dressed the wound in plaintiff in error's head, which the doctor said was made by a bullet striking the skull and deflecting. It did not penetrate or fracture the skull. The knife wounds on his neck and wrist were not of a serious character. After his stomach had been washed out and his wounds dressed he was removed from the operating room to a bed-room.

Plaintiff in error, while in the hospital, in the presence of Frank Michels, chief of police of the city of Aurora, and others, made a statement, which was taken down in shorthand by Mamie Michels, a daughter of Frank Michels. This statement was introduced and read in evidence. In that statement plaintiff in error said that on the way to the place where Estella Dumas was to take the car for Chicago she asked him for more money. He replied to her that she had a check for $150 he had given her; that he had also during the week given her another check for $20 and $20 in money, and said he did not have the money to give her; that he had given her about $190 during the week, and that was all he could afford. The woman said she had to have the money,—that plaintiff in error had promised it to her, and she must have it to get her property clear. He stated his reply was that he could not give it to her. She then asked if he had the money, and plaintiff in error replied he had. Thereupon the woman grabbed a gun she had and shot him, inflicting the wound in the scalp. He said he then grabbed the gun away from the woman

and shot her as long as the gun would shoot, and did not
know how many times he hit her. She cried out, "Oh, my
God!" and fell. He thought she walked a few steps be-
fore falling. He said the woman did not say anything
about intending to shoot him; that he caught her wrist
with one hand and pulled her toward him and with the
other hand wrenched the revolver from her. She stepped
back and he began shooting. She was then about five or
six feet from him. He said the woman always carried
a gun in her hand-bag. After the shooting he said he
thought, "What have I done? What will I do?" He then
started down the street and threw the gun away. After
going about a block he turned west and went behind a
small red building, where he remained an hour or more.
While there he attempted to commit suicide with his pocket
knife, but it was very dull and he did not succeed. He
bled considerably and felt weak from loss of blood. He
next went to a house that was unoccupied, entered and re-
mained there some time. He said he bled freely while in
the house and for a while did not know anything. Finally
he became aware that he was cold and left the house, and
after passing two or three farms went into a barn and hid
in the hay mow. He remained there until about six o'clock
in the evening of Thursday following the homicide, then
started for his home in Plano, and arrived there between
four and five o'clock Friday morning. He went to bed and
got up about eight o'clock. While preparing to shave, his
wife came to him and asked what he was doing. He said
he had come home to clean up. She told him the officers
were after him, and he requested her not to let them take
him in Plano. He said he had come home to clean up and
get some clean clothes and intended to go to Aurora and
surrender himself to the authorities. He heard the officers
coming a half or three-quarters of an hour later and con-
cealed himself in the attic of his house, where he was cap-
tured. He detailed at length the story of his associations

with Estella Dumas since he became acquainted with her, about three months before the homicide; of his going with her to Streator and Pontiac to look after some land she claimed an interest in; of their going to Chicago together, where they stayed four or five days and then went to Montgomery, arriving there the day before the homicide.

Plaintiff in error testified in his own behalf on the trial. He testified Estella Dumas took him by the arm on the way to the car she was to take for Chicago and said she must have more money; that she had to get a new hat and coat and had to go to Pontiac on business. He told her to get the check he had given her, cashed. She asked him if he was coming back Monday, and he replied he did not think he could. She inquired when he would come back, and he said he did not know; that he had some business to attend to and would be unable to get away for two or three days. She asked him to go to Plano and get the check he had given her cashed, and he advised her she could get it cashed in Chicago. She said she thought he was going to drop her and did not want to get the check cashed, to which he replied that was not the case but that he could not get away. He was looking toward the approaching car, the headlight of which was visible. As he turned, facing the woman, he saw she had a gun in her hand. His further testimony as to the circumstances of the homicide, as abstracted, is as follows: "I made a grab for the gun and it was shoved up and went off. With that I felt a stinging in my head. I became partly unconscious. Everything seemed to be whirling. That was as near as I can describe it now. I don't recollect any more that happened until I came to in the house down there. I was on a bench of lath or lumber there. It was a new house that I had got into, I should judge from the surroundings. It was dark but quite light outside. When I came to I was cold. My head was aching and there was a ringing in my ears. I got up on my elbow. My hat had fallen off. I felt around

my neck. My shirt seemed to be wet and sticky. I felt around and felt blood on my face and the blood had clotted on my head. Then I began to think, and things came back to me,—where I had been and where I was. It was just as though I was coming out of a dream. That is what it appeared. I was weak and staggered. I felt around and found my hat. My head was sore. I went to the door and went out. As I remember, the moon was shining. I looked up and down the road and got the location of where I was. I started down to the right. I was about exhausted when I came to the barn and pulled myself in there. I partly recollected what had taken place when I woke up. I remember last of seeing the gun. I remember hearing the report, and that stinging sensation in my head, and that everything was whirling around, and I remember hearing her say something like, "O, my God!"—something of that sort,—and I wondered what had happened. I thought I would go back home to Plano. I went down the road and thought I was lost, and went back. I was exhausted and climbed into this barn. I climbed up on the hay and lay there that night. The next day it was getting colder and I got deeper in the hay. Monday I was sore and weak. My head ached and rang. I began thinking about what had happened and where I had been and what I had got into with this woman, and I thought about my family. That night I got down and stumbled across a can of milk. I drank a little. I didn't want much. It made me sick. Then I went back and lay down. My head ached all the time. I was in a terrible condition. I hated to go back to my family, and I was wondering what had happened to the woman. I remembered seeing her fall. I stayed there until Thursday, and I thought I would try and make for home. I started between six and eight o'clock. On the way I would sit down and rest. I kept on until I got up over Hadden Hill and then I went on to Plano. I felt in my overcoat pocket in the vacant house but didn't find any

revolver, but I found a knife. It occurred to me that I had cut my wrists and a gash in my throat. It occurred to me that something had happened. I remembered hearing her say, "O, my God!" and seeing her fall. I remember grabbing the gun and I thought I had shot her. * * * I could not state how close the woman was to me when she shot. She shot. I grabbed the gun. I didn't pull the trigger. I didn't have the gun at the time of the discharge. I suppose I got the gun from her. She was perhaps three feet from me when she shot. I don't know whether I told Michels she was six feet or not. My head was not clear at that time. I don't know how many times I shot. I don't remember what I did with the gun." Plaintiff in error further testified he did not know Estella Dumas was dead until his wife told him after he had gone home; that he had no angry feeling toward her and did not intend to kill her. He admitted the revolver used was his. He said he carried it in his overcoat pocket, and that the woman must have taken it from his pocket at the place where the shooting was done or at Stahlle & Waller's place. He said he took poison for the purpose of destroying his life when he heard the officers coming for him but had no recollection of inflicting the knife wounds upon himself; that he was "out of his head,"—did not know what he was doing and did not know he had killed the woman.

The theory of the prosecution was and is that plaintiff in error shot himself with suicidal intent after first shooting the woman. This, it is contended by plaintiff in error, is shown to be erroneous by the testimony of witnesses who testified to hearing the shots. George Hurteau, who saw the parties on the street not far from where the shooting occurred, testified that he had gone into his house and picked up a newspaper when he heard three shots; that the first two were in quick succession, and there was an interval, he estimated, of two or three seconds between the second and third shots. He testified the first shot appeared

to be a low, muffled shot, and he heard a kind of scream. Instantly another shot was heard and after it the scream died away into a kind of gurgle. Zachariah Taylor testified he was on the roof of his house, one block north-east of the corner of Clay and Main streets, fixing a flue when the shooting occurred; that he heard three reports of a gun in a south-west direction; that they were in rapid succession; that there was a little interval between the first two, but very little; that "they were fired as quick as they could be shot off; the three shots were practically in quick succession." Charles Lightbody, who met plaintiff in error and deceased on the sidewalk on their way to the car, testified that shortly after passing them he heard a shot and in about two seconds heard two more; that after the first shot there was an instant's pause, then two more shots. George Cooney testified he lived at the corner of Clay and Main streets; that he was at his home the evening of December 17 and heard four shots fired; that "the first was a muffled shot, the next three were plain shots; they were right in rotation,—one shot right after the other; I heard a person halloo right after the shots; I heard more than one cry." John Healy testified he was at the corner of Main and Webster streets, three hundred or three hundred and fifty feet from Clay street; that he heard four shots; that the first one seemed to be a muffled shot, the others being louder; that there was first one and then three. The witness said he turned and looked in the direction of the noise and saw the flash of the last shot; that the flash was from the east toward the west and slanting downward; that the last three shots were fired in quick succession,—no interval between them. A. J. Turco, who testified to having passed a man and woman standing at the corner of Clay and Main streets, said when he was about fifty-five yards away from that place he heard four shots; that "the first shot was a muffled shot, then there was just an instant between the first and second shot, and the three last shots

were in rapid succession." The witness heard a moan twice during the shooting.

These six witnesses were the only persons who testified to having heard any of the shots fired at the time of the homicide. It will be seen three of them heard only three reports, while three testified they heard four. Some of these witnesses testified that there was a short interval between the first report of the gun and the second report, and this, it is insisted by counsel, tends strongly to corroborate the testimony of plaintiff in error that he did not shoot himself but that he was shot by Estella Dumas, and under the provocation and excitement of the moment he took the revolver from and shot her, either without any comprehension of what he was doing or at least without any malice or deliberation. It is argued if plaintiff in error had formed in his mind the design and intention to kill Estella Dumas and take his own life there would have been no interval between the first and second shots; that the interval would have occurred after plaintiff in error had accomplished his purpose of killing the woman and when he turned the weapon upon himself. There is nothing in the record to indicate that the witnesses who testified to hearing shots fired were not honest and truthful and told the circumstances as they remembered them, but it will be seen their memories disagreed as to the number of shots fired and the order in which they were fired. This is by no means surprising or strange. None of the witnesses realized that a homicide was being committed and some of them gave the matter little attention. As two of the witnesses (Hurteau and Cooney) remembered it, there was no interval between the first and second shots but all three of the reports they heard were in rapid succession. Taylor testified there was very little interval between the first and second reports; that all three of the shots he heard were in quick succession,—as rapidly as they could be fired. Four of the six witnesses who heard shooting testified that

the first shot had a muffled sound. The condition of the woman's clothing tends to account for this from the close proximity of the revolver to her body when the shot was fired. The clothing she had on at the time of her death was introduced in evidence. Two bullets penetrated the body of Estella Dumas, one of them passing through her heart. The clothing around each bullet hole was burned,— around one of them more than the other. The burn around one of the bullet holes was through the outside coat, which was buttoned up, and through all the other garments to the woman's body. It was evident the revolver must have been held close to the body when these shots were fired, to have burned the clothing as badly as it was burned. The jury might reasonably conclude that the muffled sound of the first shot was the result of the revolver having been held against or very close to the body. If that was the fact, it refuted the testimony of plaintiff in error and the theory of his counsel that the first shot was the one that wounded him and was fired by Estella Dumas.

While plaintiff in error was the only person testifying who was in a position to know the facts, we cannot say the jury were not justified in disbelieving his story that Estella Dumas shot him first. His statement to the officers after his arrest and his evidence on the trial differed in material respects. He gave the officers a very clear statement of his acquaintance and association with Estella Dumas, and there was no substantial difference between that statement and his testimony on the trial, except the account of how the shooting occurred, his realization of what had occurred at the time and what he did immediately following. In his statement to the officers he said the revolver with which the shooting was done belonged to Estella Dumas and that she usually carried it in her hand-bag. He told of throwing the revolver away soon after leaving the place where the shooting occurred; where he went; how he felt about what he had done; of attempting to take his

life with his pocket knife; of his bleeding until he felt weak and for a while did not know anything; that he recovered and went to the barn, where he concealed himself for several days, during which time the only food he had was milk he found and drank at night. In his testimony, which we have above quoted from the abstract, he claimed he was rendered partly unconscious by the first shot, fired while he was trying to take the revolver from the woman, and did not know anything until he returned to consciousness in the unoccupied house where he had fled after the homicide. He admitted the revolver found near the scene of the shooting, with one loaded and four empty chambers, belonged to him. The discrepancy between his statement to the officers and his testimony on the trial is attempted to be explained on the ground that when he made the statement to the officers he was in bad mental condition and was suffering from the effects of poison taken just before his capture. Undoubtedly he was in a distressed condition of mind and was sick from poison when he told his story to the officers, but we find in the record no indication of mental derangement, either from the poison or the treatment given him by the doctor at the hospital, that could justify or reconcile the differences in the two stories. Neither do we think great weight should be attached to the proof that the mother of the plaintiff in error was not mentally sound, and the possible effect that might have been produced upon him by the wound in his head. Dr. Geyer testified that he had made experiments to determine the distance shots had been fired, from objects shot at. The hat worn by plaintiff in error when the shooting occurred was produced and exhibited to him. It had one bullet hole through the rim and two in the crown. The doctor testified he found powder in the clotted blood on the hat and in a circle surrounding the bullet hole, about five inches in diameter. From the appearance of the hat the doctor gave it as his opinion the revolver was at a distance of twenty

to twenty-two inches when fired, and that a man could not hold a revolver at that distance and shoot himself. Dr. Marstiller examined the hat and gave it as his opinion that the revolver must have been held very close when the shot was fired,—in his judgment, within an inch of the hat.

We believe we have set out fully the substance of all the testimony tending to throw any light upon the question of how the homicide occurred, and we deem it unnecessary to enter into any extended argument about it. It is sufficient to say that the story of the killing as told by plaintiff in error is in itself so remarkable as to almost seem incredible if there were no contradictory evidence. While Estella Dumas was an immoral woman, there is not a circumstance or word in the proof to indicate that she was of a dangerous or murderous disposition. According to the statements of plaintiff in error himself, their separation was to be for but a few days, when he promised to join her again. She had a few dollars in money and his check for $150, which was sufficient for.her present needs. He was undoubtedly much attached to her, and if he lived she might reasonably have expected his return to her and that he would supply her with more money. It is difficult to comprehend how, under all the circumstances, she should suddenly and without provocation determine to murder him in a public street, where she could have had no hope of escape. But it is said there is less reason to believe that plaintiff in error would conceive and execute the design of murdering Estella Dumas under the circumstances. Of course, such grave and important questions cannot be determined upon mere theories unsupported by evidence, but we have the undisputed fact that plaintiff in error did shoot and kill Estella Dumas. The killing was done with his own gun, which he threw away near the place of his destructive work. In all his statements of how the killing occurred he claimed the woman attempted to shoot him first, but in other material respects his stories were con-

flicting. As a mere theory, we would think it more likely that plaintiff in error formed the design to kill the woman and then take his own life. He admitted he was infatuated with the woman. They had been much together for three months, and the last week they had been staying in Chicago and drinking heavily. They continued to stay together and drink after their return from Chicago to Montgomery. It became necessary for him to return to his home and family in Plano. No doubt after his long period of dissipation with an immoral woman it was a severe trial to him to return to his family. What men may do under such circumstances can only be conjectured from what they have done. That plaintiff in error is the type of man who will sometimes take his own life under great mental trouble and distress is shown by the proof, for he admits twice attempting to commit suicide after he shot Estella Dumas. The solution of this case, however, does not depend upon theory and conjecture nor upon probabilities. There is sufficient legal and competent evidence in the record,—disregarding the testimony of plaintiff in error, as the jury evidently did,—to justify the verdict.

It is contended by plaintiff in error that there was no testimony whatever upon which a verdict of murder could be based, and the court therefore erred in instructing the jury as to the meaning of the term "malice" and when it would be implied. What we have previously said upon the evidence sufficiently disposes of this question. There was no error in giving the instructions on the subject of malice.

The thirteenth, fifteenth and sixteenth instructions given on behalf of the State were upon the subject of self-defense. It is not claimed they stated incorrectly the law but that it was error to give them in this case, as it is claimed plaintiff in error did not rely upon self-defense as a defense. The sixth instruction given on behalf of plaintiff in error was upon the subject of self-defense, and after defining the circumstances under which one person may

take the life of another in self-defense, told the jury that if they believed, from the evidence, the deceased assaulted plaintiff in error with a deadly weapon they should acquit him. We cannot, therefore, say the court erred in giving the instructions for the State.

Several articles of clothing worn by deceased at the time she was killed, consisting of her coat, waist, corset and shirt, were introduced in evidence. Upon the jury retiring to consider their verdict, counsel for plaintiff in error objected to the jury taking to the room the articles of clothing mentioned. The court overruled the objections, and the action of the court in so doing is assigned as error. The objection made is, that the clothing was stained with the blood of deceased, and the garments were gruesome objects and tended to excite the prejudice and passion of the jury. It is common practice for courts to send to the jury room objects which have been introduced in evidence where such objects are of assistance to the jury in illustrating or elucidating some controverted question involved in the evidence. It is contended that the clothing here taken to the jury room did not answer that purpose, as it was admitted that plaintiff in error shot deceased at close range, and an inspection of the clothing was not necessary to determine that question. Plaintiff in error testified that deceased was about three feet from him when he shot. Dr. Geyer inspected the garments and gave as his opinion that the shot which penetrated the heart of the deceased was fired within six or eight inches of her body and the other one about one foot. Dr. Marstiller thought the one through her heart was fired about an inch from her and the other about one foot. The doctors testified to the effect of powder burns upon the clothing and the area affected by the powder when the gun was discharged at different distances. In view of the testimony it was not erroneous for the clothing to be examined by the jury while considering their verdict, and for that purpose it was

proper to send it with the jury in their retirement. In *Henry* v. *People,* 198 Ill. 162, it was said: "This court has held that physical objects which form a part of or serve to illustrate the transaction or occurrence which is the subject of judicial investigation may be displayed before the jury and formally introduced in evidence." In *Painter* v. *People,* 147 Ill. 444, complaint was made of the action of the court in permitting the bed, mattress, sheets, pillows and other bedclothing pertaining to the bed in the room where the deceased was murdered, together with the apron found in the room, and defendant's overcoat, to be displayed before the jury during the course of the trial and to be introduced in evidence. The court said: "We are of the opinion that the time and manner in which objects of this character shall be displayed in the presence of the jury is a matter wholly within the sound discretion of the court, and we are unable to see anything in the record sufficient to warrant us in holding that such discretion was abused in the present case." In *Bell* v. *State,* 32 Tex. Crim. 436, a new trial was asked on the ground that the clothing worn by deceased at the time of the homicide was taken by the jury on their retirement. The clothing had been introduced in evidence and examined during the trial. It was held that a new trial was properly refused. In *Jack* v. *Territory,* 2 Wash. Ter. 101, it was held not to be error to allow the jurors in a capital case to take to their room a hat belonging to the defendant and a blood-stained shirt, both of which were found near the place where the crime was committed and which had been introduced in evidence. In *McCoy* v. *People,* 175 Ill. 224, it was held proper for the jury to take, on retirement, the bullet removed from the body of the deceased and the revolver belonging to the accused, where both had been admitted in evidence. In this case it was important to determine how close the revolver was to deceased when discharged. The testimony was somewhat conflicting. An inspection by the

jury of the powder-burned clothing in the light of the expert testimony upon that subject was an aid to them in reaching a correct conclusion upon this feature of the case. The objection is based on the ground that the garments were bloody.  If properly taken to the jury room for one purpose, the fact that they were blood-stained would not make it improper.  As was said in *Painter* v. *People, supra,* this is a matter within the sound discretion of the court, and unless it affirmatively appears that this discretion was abused and injury resulted therefrom we would not be justified in holding it erroneous.

We have examined the complaints made of the court's rulings in admitting and rejecting testimony and are of opinion there was no error in that regard.

Finally it is contended that the court erred in not granting a new trial on account of the bias of juror H. A. Waters.  With the motion for a new trial plaintiff in error filed the affidavits of Frank Bean and Earl Grice.  Bean stated in his affidavit that he was a barber, and while shaving juror Waters on the evening of December 11, 1911, Waters said he was sorry he had to come down town as he had been summoned on the jury in the Morris case, but that he would get off all right as he had read the papers and knew all about the case; that affiant said he thought Morris ought to get from one to fourteen years, to which Waters replied, "Yes, he had a wife and a couple of kids; that he had no business running around with a whore, and that he was no better than she and he ought to be punished for it."  Grice was also a barber.  He stated in his affidavit that about two weeks before the trial began, while shaving Waters, he (Grice) spoke of the coming trial of plaintiff in error and said he would hang him, to which Waters replied, "Well, the chances are I would, too."  The State filed the affidavit of the juror in opposition to the motion for a new trial.  In his affidavit Waters admits being shaved by Bean on December 11 and saying to Bean

254—37

he was sorry he had come down town and got caught on the jury; that he further said to Bean he did not believe they would take him on the jury because he did not believe in circumstantial evidence; that this was the substance of the conversation, and he positively denies making the statements contained in Bean's affidavit. The juror denies he had ever discussed the case with Grice, and denies that Grice ever made the statement to him and that he made the reply to Grice set out in said Grice's affidavit. On his *voir dire* examination Waters stated he had read newspaper accounts of the shooting and had an opinion which would require evidence to remove, but had not expressed that opinion outside of his own home. He further stated he would be governed by the evidence produced at the trial and would follow the law freely and willingly. Proof that will justify setting aside a verdict on the ground of the prejudice of a juror must be clear and satisfactory. (*People* v. *Strauch,* 240 Ill. 60; *Davison* v. *People,* 90 id. 221; *Hughes* v. *People,* 116 id. 330.) Juror Waters frankly stated in his examination prior to his acceptance as a juror that he had read of the homicide and had an opinion it would take evidence to remove. He denied having expressed any opinion outside of his own home, and we are not satisfied that the showing here made in support of the contention that he had expressed opinions unfavorable to plaintiff in error, showing prejudice that would make him an unfair or incompetent juror, is sufficient to justify a reversal of the judgment on that ground.

There is nothing in the record that in our opinion affords any reasonable basis for a reversal of the judgment.

*Judgment affirmed.*