(No. 25943.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK UHER, Plaintiff in Error.

*Opinion filed December 16, 1940—Petition stricken Feb. 12, 1941.*

WM. SCOTT STEWART, for plaintiff in error.

JOHN E. CASSIDY, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, and MELVIN S. REMBE, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Frank Uher, was indicted for the murder of his wife, Mary Uher, in the criminal court of Cook county. A jury found him guilty and fixed his punishment at imprisonment in the penitentiary for life. Judgment was rendered on the verdict, and the defendant prosecutes this

writ of error, seeking a reversal on the sole ground that the evidence does not support the verdict.

March 16, 1937, the defendant, then sixty-three years of age, his wife, but little younger, two adult sons and two daughters, resided in a six-room bungalow at 6431 Bishop street in Chicago. Prior to the day named, quarrels between defendant and his wife had developed into physical conflicts. A violent encounter between defendant and his son John in the late afternoon of March 16 resulted in fatal wounds to the latter and, as a sequel, the death of Mary Uher. There were no witnesses to the second homicide. From a voluntary, unsigned statement made at a police station, an officer's version of the statement, and the testimony of the defendant upon the trial, it appears that John Uher was at home when defendant arrived from work about 4:30 P.M.; that an argument relative to the disconnection from an electric socket of a heating apparatus used by defendant to relieve his rheumatism led to blows and during the course of the altercation defendant took a knife out of an inside pocket of his coat, removed it from the scabbard and slashed at John, cutting him many times. Defendant asserts that he was pushed into a bedroom, that John held the door, calling his mother; that while he, defendant, was attempting to leave the room, John released the door, ran toward the rear door and that he followed in pursuit through the kitchen to a porch, then down the basement stairs to go out the door into the yard. As defendant reached the stairway mentioned, his wife who had been engaged with the laundry in the basement was standing at the landing, holding an ordinary household hatchet with a handle about fifteen inches long, and defendant relates, cursed him, adding, "I kill you." Defendant slashed at his wife with his knife and she dropped the hatchet. According to defendant he thought he might lose his own life, and for this reason protected himself. The hatchet was subsequently found on the premises, with no blood stains on it, and was intro-

duced in evidence as one of the People's exhibits. Referring to their respective positions on the stairway, defendant, in response to queries at the police station, said that he was standing on the last step from the top—the first step from the bottom—of the stairway, his knife in his hand and that his wife had the hatchet in her right hand, adding, "She want to hit me and I hit her," that he stabbed her in the left shoulder with the knife, that the hatchet fell the first or second time he stabbed her, and that she started to scream. Upon the trial defendant testified that when his wife had the hatchet in her hand, "I am on top of the step and she is standing on the cement walk and by the door." He admitted, on cross-examination, that his wife did not hit him with the hatchet, "Because I am on top of the step," that she was on the bottom step and "I hit her first. I protect my life because [if] I didn't hit first she chop my head. I was going down. I was not going the front step I was going to the bottom step. I hit her the last step I come down." Although defendant saw his wife bleeding after stabbing her he ran away in pursuit of his son, still carrying the knife. John Uher, the son, we observe, succeeded in making his escape but died before reaching a hospital. Upon leaving the house, defendant repaired to the office of an attorney who, upon hearing his story, took him to the Lawndale police station. When examined at the station, abrasions were found about defendant's right eye, in the vicinity of the right temple and on both forearms.

Additional facts and circumstances merit mention. A neighbor, Martha E. Kosty, testified that about 4:30 P.M. she saw defendant walking back and forth in his rear yard wiping his hands, and his wife seated at the witness' back fence. After attending the furnace in her own basement she observed that defendant had departed but that his wife was still sitting in the same place, with her back toward the witness. Receiving no response when she spoke, Mrs. Kosty approached closer and saw that Mary Uher's face was white

and full of blood. A second neighbor, Catherine O'Leary, saw defendant as she went out marketing. To her greeting, he replied, "Hello there; well, when I do a job I do it well." She noted that defendant's hands were covered with blood. Mrs. O'Leary also saw Mary Uher, sitting down in the back yard, covered with blood, and endeavored in vain to revive her. Defendant admitted that he saw Mrs. O'Leary as he came out of the house, but denied exchanging words, and added that he did not see any other person he knew. When a police officer arrived about 4:50 P.M., in response to Mrs. Kosty's summons, Mary Uher was sitting on a stone slab in the yard, her back against the fence, just outside the door of an enclosed porch. She was then dead.

A report made by a physician connected with the office of the coroner discloses that there were multiple stab wounds of the face and chest of Mary Uher, two having penetrated the chest cavity, and that in the physician's opinion these wounds caused her death.

Defendant argues that his uncontradicted testimony to the effect that he killed his wife in self-defense rendered the verdict against him untenable. The answer to this argument is found in the Criminal Code which provides: "If a person kill another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear also, that the person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given." (Ill. Rev. Stat. 1939, chap. 38, par. 367, p. 1167.) This court has held that where a defendant is the only person to testify as to the actual facts of the homicide with which he is charged, the jury is not compelled to accept his statements but may consider the surrounding circumstances and, also, the probability or the improbability of his narra-

tion. (*People* v. *Strause*, 290 Ill. 259; *People* v. *Morris*, 254 id. 559.) Here, responding to her son's cry for aid, the deceased came out of the basement with a hatchet in her hand. Standing above her at the top of some stone steps was the defendant brandishing a knife. By his own admission, he went down the steps to his wife, stabbed her repeatedly and, while being attacked, the latter dropped the hatchet. It is not contended that deceased struck defendant, his testimony being merely that she desired to strike him with the hatchet and that, instead, he went down the steps and stabbed her first. The hatchet, when found, had no blood on it, tending to indicate that if deceased ever did have the weapon she dropped it before her husband stabbed her. Moreover, defendant did not explain how his wife could have gotten from the bottom of the steps leading to the basement and taken a sitting position on the stone slab by the back fence if stabbed in the manner he described. Motivated with malice towards several members of his family, including his wife and their son John, defendant was angry as the result of his encounter with his son, was incensed at his wife for coming to the son's assistance, and because of previous difficulties may well have been ready, if not eager, to mortally wound her. By his own testimony, the deceased was in a position where she could not harm defendant and he, nevertheless, descended the steps and killed her. The foregoing, and other circumstances narrated, amply justified the jury in rejecting the specious defense interposed by defendant. Its verdict will not be disturbed.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*