(No. 33125.—

The People of the State of Illinois, Defendant in Error, *vs.* Frank Jordan, Plaintiff in Error.

*Opinion filed September 23, 1954.*

Cecil L. Cass, of Chicago, for plaintiff in error.

Latham Castle, Attorney General, of Springfield, and John Gutknecht, State's Attorney, of Chicago, (John T. Gallagher, Rudolph L. Janega, and Arthur F. Manning, all of Chicago, of counsel,) for the People.

Mr. Justice Klingbiel delivered the opinion of the court:

Plaintiff in error, Frank Jordan, 29 years of age, hereafter referred to as the defendant, was found guilty of manslaughter upon trial by a jury in the criminal court of Cook County. At the close of the People's evidence

and again at the close of all the evidence motions by defendant to direct the jury to find him not guilty were overruled. After verdict, motions by defendant for a new trial and in arrest of judgment were likewise overruled and thereupon the defendant was sentenced to the penitentiary for a term of not less than one year nor more than three years. Defendant has sued out of this court a writ of error to the criminal court of Cook County for a review of his conviction and sentence.

Although defendant has assigned ten errors upon the record, he has confined his argument to but one, and that may be summarized as: The State did not prove defendant guilty beyond all reasonable doubt, by reason of which the trial court erred in not directing a verdict of not guilty, and that in such case it becomes the duty of this court to reverse the resulting judgment of conviction.

In criminal cases we have often said that it is our duty, where a verdict of guilty is returned by a jury or where a similar finding is made by a court where a jury has been waived, not only to carefully consider the evidence but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged. (*People* v. *Scott,* 407 Ill. 301, 304.) In order to determine whether or not this contention is applicable to the facts in the instant case we must, of necessity, examine the evidence introduced upon the trial.

The material facts in evidence at the close of the People's case show that the defendant at about 11:30 on the night of June 15, 1952, left a tavern at 5905 West North Avenue in the city of Chicago; that he then walked west on the south side of North Avenue; that at 5917 West North Avenue there was a filling station then being attended by one Arthur Erickson, the deceased.

At this station there were four gasoline pumps that came right up flush with the sidewalk and directly south

of the pumps, some forty or fifty feet, there was a small building used as the station office. When the defendant was approximately fifty feet east of the east pump and walking west, the deceased started to walk from the station office towards the pumps.

There were no eyewitnesses as to what actually happened when the two men met, and the only evidence in the record as to what actually occurred at that time and place appears in a written statement signed by defendant and introduced in evidence as part of the People's case and also in the testimony of the defendant after the close of the People's case.

In the written statement given to the police by the defendant, he stated, among other things, the following: "As I was walking by this gas station, I see this Art who I don't get along with, so I called him a jerk and an ———— and he says, 'I'll show you who's an ————' so he ran after me swinging a sap and twirling it on a string. I ducked under it and hit him with my fist. He went down and I guess he must have hit his head and I stopped the first car and told them to call the police and an ambulance. The police came and I surrendered to them. I had had trouble with Arthur Erickson before about three weeks ago in a food shop * * *. From then on we didn't get along."

The evidence further shows that the deceased was found just inside the island or concrete base upon which the pumps were situated, with his left foot and part of his left leg up over the island or concrete base, his head was facing west and he was on his back. The nozzle of pump number six was on the ground. Erickson was removed to St. Ann's Hospital where shortly thereafter he died of the injuries received. There was sufficient proof to the effect that the deceased came to his death as a result of the injuries which he sustained when he fell to and upon the concrete driveway or curb at the filling station.

Immediately after the defendant realized that Erickson had been seriously hurt, defendant ran out to the street to hail a passing auto and one Margaret Kenney, a witness for the prosecution, who was driving east on North Avenue about to pass the gas station, stopped her car, whereupon defendant told her he had just struck a man and asked her to get in touch with the police or get somebody to help him. She testified defendant was excited and his main thought was to get help for the man that was lying there. She called the police and reported it as an automobile accident and later when she asked defendant whether he had run over the man he answered, "No, I hit him. He swung a gas nozzle at me and I hit him." She testified further that defendant did not say it was a flash light, and that defendant appeared to be sober, but agitated and excited; that he remained there until the police came, standing right there where the party that was injured was lying.

Edward Emond, another prosecution witness, testified that as the defendant was walking west on the sidewalk adjacent to the filling station Mr. Erickson was walking north towards the pumps.

Lawrence Keegan, a fourth year high school boy called by the prosecution, testified that he was a part-time helper at the filling station, having just gone off duty there and was sitting with the witness, Edward Emond, in a car across the street from the filling station, facing south; that after Erickson was on the concrete he went over there and sort of took charge of the station; that he noticed the nozzle of pump number six was on the ground—it was crossed over the body by his (Erickson's) right hand, about six inches away; that he never at any time saw defendant step off the sidewalk; that he also saw a flash light there on the ground. It belonged to the gas station and that Erickson carried a sap or billy on him for his own protection; it wasn't on the ground. It was in his pocket.

Officer Schmitz, a witness for the prosecution, testified that when he asked defendant if he caused the injuries, still not sure in his mind whether it was an auto accident, the defendant said, "I hit him with my fist." The officer testified that when he and his associate officers arrived on the scene they did not at first see the defendant, but when they placed the stretcher in the patrol wagon defendant came around the side of it and was there when they placed the injured man into the ambulance; that defendant at no time made any attempt to escape and that he asked defendant to step into the patrol wagon which took the injured man to the hospital, and that he asked the defendant his name and the name of the injured man, which information the defendant furnished.

Officer Troogstad, a witness for the State, testified that in a conversation he had with the defendant in the emergency room at the hospital the defendant told him of .the trouble he had with the deceased about two weeks before; that they called each other names and that the deceased started chasing defendant with a sap; that defendant hit him once and deceased went down .and struck his head on the island. This witness, on cross-examination, testified that he found a black jack stuffed down in the back pocket of deceased.

The foregoing in substance is all of the material evidence introduced by the State at the time the People rested its case.

For the defense, after the court overruled defendant's motion to direct a verdict in his favor, the defendant, Frank Jordan, was the only witness who testified, and the substance of his testimony was that he left the tavern between 11:15 and 11:20 that night and was going home. He started walking west toward Austin Boulevard and there was this gas station two or three doors west of the tavern and the first time he saw Erickson that night was when he, the defendant, was on the sidewalk about fifty

feet from the east end of the island where the gas pumps are located; (he had known Erickson about two years); that he observed Erickson by the station office which is about thirty feet from the pumps; that defendant kept walking west and the deceased called him a name, that both of them kept walking until Erickson got up to the island; that just as he got to the pumps they met and that they were calling each other names, that Erickson had a black sap in his hand and swung it at defendant; that defendant ducked under it and hit Erickson on the face somewhere; that Erickson staggered back and fell forward and hit his head on the concrete island, and rolled over on his back.

Defendant knelt down, saw that Erickson was unconscious and that he could not do anything for him so he ran out and stopped the first car. He then again tried to do something for the injured man, got his hands full of blood, went over to the tavern and washed them off and then returned to the filling station, at which time the police were already putting the injured man in the ambulance; and defendant told one of the officers that he was the one that hit the injured man. He went to St. Ann's Hospital with the police and stayed right there all the time.

Getting back to the occurrence, defendant testified that he never got off the sidewalk until after he saw the man was injured; and that at the time he swung at the injured man the defendant was still on the sidewalk; and that Erickson had come out from the island by the pumps; that Erickson had some black object in his hand but defendant could not tell at that time what it was, defendant knew that Erickson carried a black jack, he had shown it to defendant several times saying that if anyone got smart with him or tried to hold up his place he just carried it for his own protection; that defendant had seen the black jack several times; as to what Erickson had in his hand at the time of the occurrence defendant thought it was a

black jack but found out later it was a flash light; that a flash light was lying on the ground there after Erickson went down.

On cross-examination of defendant, the prosecutor, among other things, brought out that at the coroner's inquest the defendant had testified that the deceased swung at him with a flash light and that after the deceased had gone down the flash light was lying there.

Defendant further testified that when Erickson and defendant met, Erickson was standing on the island between the two pumps and when he said "I'll show you," he swung at him with a black object which he had in his hand; and that it was a flash light and it was lying on the ground there after it was all over.

The statute, in so far as it is pertinent in this case, provides that: "Involuntary manslaughter shall consist in the killing of a human being without any intent to do so, in the commission of an unlawful act, * * *." (Ill. Rev. Stat. 1951, chap. 38, par. 363.) The indictment returned against the defendant, in substance, charged in the first count that defendant unlawfully, feloniously and wilfully made an assault upon the decedent, Arthur Erickson, with his hands and fists, as a result of which said decedent fell upon and against a certain sidewalk sustaining injuries which caused his death; and in the second count, it is charged that defendant unlawfully and wilfully, by striking, did kill and slay said Arthur Erickson.

It is at once apparent that the evidence in the record, herein set forth by us in detail, wholly fails to support any of the charges contained in the indictment. Nowhere in the record is there any evidence which convinces us beyond a reasonable doubt that in striking the deceased with his bare fist the defendant was committing an unlawful act. On the contrary all of the evidence points to but one conclusion and that is that defendant struck the blow in self-defense. There is no evidence in the record to the

contrary, and defendant's testimony to the effect that the decedent was the aggressor is corroborated in part by the testimony of the witnesses Emond and Keegan, each of whom testified that just before they saw decedent lying upon the concrete part of the filling station, they saw him walking north toward the gasoline pumps, while defendant was walking west upon the sidewalk adjacent to the pumps, and that at no time did they see the defendant off of the sidewalk.

There was, therefore, no conflict in the evidence as to which one of the two men was the aggressor nor as to whether or not the defendant struck the blow in self-defense. The only conflict in the evidence was the one created by defendant himself in reference only as to whether the object with which the deceased came at him was a gasoline nozzle, a billy or a flash light. This conflict, however, is upon an immaterial matter, for the defendant would have had the same right to defend himself whether decedent came at him with either one or the other of said objects in his hand, or if he had come at him without any object whatever in his hand, as it does not necessarily follow that because the defendant said at one time that the object in the hand of the deceased was a gas nozzle, and at another time that it was a billy, and at still another time that it was a flash light, that, in one or the other instances, he was wilfully swearing falsely. He could have made each of those statements believing them to be true at the time he made them. The record is clear that he was extremely upset, agitated and excited, and this could easily account for the confusion of the defendant on this point.

To support the judgment of conviction in this case, defendant in error argues that where defendant is the only person to testify for the purpose of establishing self-defense, the jury is not compelled to accept defendant's statements but may consider the probability or improba-

bility thereof, and the surrounding circumstances; and further that the reviewing court will not substitute its judgment for that of a jury because the testimony is conflicting unless, from a consideration of all the evidence, there is reasonable doubt of defendant's guilt.

Implicit in the first part of the foregoing statement is that there is evidence in the record supporting a conclusion that the blow was unlawfully struck, or in other words that there is a conflict in the evidence, or that there are at least two versions from which to choose, one of which could support a verdict of guilty. This is entirely wanting in this case. Here we have only one version of what occurred when the two men met. It is the version of defendant, and if it is not improbable, nor uncorroborated, nor contradicted in its material parts, then the jury may not disregard or reject it, and if the jury as in this case, does reject it, then such action must be regarded as the result of passion or prejudice of the jury. The rejection of defendant's testimony by the jury still does not have the effect of supplying proof of defendant's guilt beyond a reasonable doubt sufficient to sustain the conviction of defendant.

The foregoing rule is not without some limitations. The jury may reject defendant's story if, in itself, it is so remarkable as to almost seem incredible if there were no contradictory evidence, (*People* v. *Morris,* 254 Ill. 559, 573,) or if the story of defendant was so improbable as to justify it in being disregarded by them, or if it was contradicted by the facts and circumstances shown in the record, (*People* v. *Strause,* 290 Ill. 259, 278,) or if defendant's story was so unreasonable as to be judged improbable. (*People* v. *Meyers,* 412 Ill. 136, 145; *People* v. *Uher,* 375 Ill. 499, 502.) None of these reasons, however, are to be found in the record.

Because we conclude that the entire record here leaves a grave and substantial doubt of the defendant's guilt, it

becomes our duty to reverse the judgment of conviction in this case; and it further appearing that there are no other witnesses available than those who have already testified, the cause will not be remanded for a new trial. (*People v. Bradley,* 375 Ill. 182, 185.) For the reasons aforesaid the judgment of conviction entered by the criminal court of Cook County in this case is reversed.

*Judgment reversed.*