People of the State of Illinois, Defendant in Error, v. Aaron C. Warren, Plaintiff in Error.

Gen. No. 49,678.

First District, First Division.

October 19, 1964.

Rehearing denied November 9, 1964.

John A. Pigott, of Chicago, for plaintiff in error.

Daniel P. Ward, State's Attorney, of Chicago (Elmer C. Kissane and William J. Nellis, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court.

Defendant was found guilty of murder in a jury trial and sentenced to the penitentiary for a term of 16 to 25 years. The Supreme Court transferred his appeal to this Court. Defendant seeks reversal on the grounds that (1) the evidence was insufficient to establish guilt beyond a reasonable doubt "in that the State failed to sustain the burden of proving the killing was not in self defense"; and (2) that the court erred in refusing certain instructions tendered by the defendant.

To pass upon these contentions, an analysis of the evidence is required. Frank Slavik, bartender at the Golden Lantern Tavern, 4519 S. Harlem Avenue, testified that on May 27, 1962 the defendant and the deceased, Alexander Hardie, Jr., entered the tavern

at about 9 p. m. After about a half hour, during which time they consumed two glasses of beer, Hardie left and defendant followed five minutes later.

Matthew Padgen, owner of the Hickory Gardens, a tavern located next door to the Golden Lantern, testified that the defendant and deceased entered his tavern at about 9:30 p. m., had two glasses of beer each and stayed about a half hour. They left together and entered a brown Nash Rambler station wagon that was parked in front of the tavern. He jotted down the license number of the car. At about 11:45 p. m. defendant returned alone and asked if his partner had come back. Upon being told that he had not, defendant turned and walked out.

Robert H. Brownell, and his partner Burton Stieg, police officers of the Village of Lyons, shortly after midnight, while patroling in their police vehicle, came upon the body of the deceased, still warm, lying in Hass Avenue between Oakwood and 40th. This area is sparsely inhabited. There is a forest preserve on the west side of the street and on the east side a tavern, catering "house" and further "up" north there are a few new apartment houses. A Stickney police ambulance was called and the body was taken to a hospital where deceased was pronounced dead. There were two bullet holes in the chest. In the deceased's clothes the police found a key ring with some car keys and a veteran's license identity tag. There were also found some small pills. These, upon examination, consisted of two pills containing a barbiturate acid commonly referred to as a hypnotic drug and six scored tablets found to be an amphetamine, which is commonly referred to as a stimulant drug. The pills were nonnarcotic.

Officer Raymond Dus of the Stickney police, who responded to the call for an ambulance, and who removed the body to the hospital, testified that he

looked for and found deceased's car in front of the Hickory Gardens Tavern. He spoke to some of the "citizens," then called the Lyons police and with them proceeded to defendant's home. Officer Dus knew the defendant prior to the date of the occurrence. Defendant's "yellow and brown" Nash Rambler was found parked in front of his home. He was requested to accompany the officers, after the police had searched the car with his permission. An expended bullet shell was found immediately behind the front seat on the floor of the car and there were blood stains on the back seat. When confronted with Padgen and Slavik at the tavern sites, defendant denied being in the taverns that night or having seen them. Later, at the Lyons police station, defendant denied knowing the deceased. Upon being told that the card of Alexander Hardie was found in his wallet, he stated that it was a reference to a girl who was married and that he used the name so as to avoid getting her into trouble. He told a story of his activities for the day and evening and said he got home at 1:30 a. m. This story eliminated any presence in the taverns or being in the company of the deceased. He explained the presence of blood in the car as coming from a cut finger he got helping his father that day with some concrete work. The cartridge shell, he said, was the result of "shooting with it, with a friend in the boondocks." During the questioning he asked and was allowed to talk to officer Dus alone and shortly thereafter defendant made a statement which was reduced to writing.

In this statement the defendant said that he was to meet the deceased Hardie by appointment at the tavern on Harlem Avenue. When he got there Hardie had not arrived. He went to the adjoining tavern still seeking him. As he came out of the second tavern Hardie arrived. Hardie asked about "the

tires" and he said he didn't have them with him. At Hardie's request they re-entered the Hickory Gardens and "then got into my car and drove for a short way" into the forest preserve. "He already had the gun which I gave him in Summit, Illinois." Hardie then told defendant to drive some distance and stop. Hardie then said "You lied to me, you haven't got the tires, the money, you haven't got 's—t.'" Hardie told him to get out of the car and started to open the door on his side. Pointing the gun at him Hardie said "No tires, no money, no car, no you." "Then I struggled for the gun and the gun went off twice. I put the car in reverse and he was leaning against the door and he fell out." Defendant then drove off. The police officers went to defendant's home and found the gun between the mattress and box spring of his bed.

At 10:50 a. m. defendant made another written statement under interrogation by an assistant state's attorney. In this statement he said he met the deceased about three and a half months previously in a tavern on Harlem Avenue. They became chums and he disclosed to the deceased that he had recently been released from the penitentiary. The deceased thereafter began to blackmail him by threatening to expose his penal record to his employer. Defendant, over the period, had given the deceased about 40 tires costing approximately $1000 purchased through his father's credit card. He had also given Hardie about $200 in currency which he had saved up from his earnings. On May 27, 1962 he met Hardie in front of the tavern "in Summit." Hardie asked for the gun and after receiving it asked where the tires were. He told Hardie he had them but could not give them to him. He said he lied. Just before they left the tavern Hardie showed him two pills and asked if he was willing to sell "these." When de-

378

fendant refused the deceased got "salty," cursed him and said they were going for a ride.

They drove off in defendant's car leaving Hardie's car at the tavern. After driving into the forest preserve, "all he did was bitch and moan and gripe and told me what I was and told me what his wife was." Defendant then took the wheel and drove around within the Lyons vicinity. Hardie was arguing and trying to talk defendant into selling the pills. After some period of driving, Hardie told defendant to stop the car. He pointed the gun at him and told him to get out. The deceased screamed and stuck it in defendant's face. "His door was open when he stuck the gun in my face. I grabbed for it." He thought he got the gun. "I was sitting on top of him. My weight was on his body. When I pushed up on the gun, I put my weight on his body and then I remember hearing two shots." Defendant then drove off causing the deceased to fall out. He put the gun between the mattress and bed spring of his bed when he got home.

Defendant did not take the stand in his defense.

In contending that his guilt was not proven beyond a reasonable doubt, defendant argues that under the Illinois Criminal Code, c 38, § 3–2(a), (b), and § 7–14 (Ill Rev Stats 1961), the State must assume the burden of proving not only that defendant committed homicide but the additional burden of establishing beyond a reasonable doubt that the killing was not in self defense. Defendant's argument comes down to but one proposition, namely, "that no one can tell which of the two was the aggressor," and consequently, that the People's case which was one of "mere circumstantial evidence," failed to establish defendant's guilt "so thoroughly as to exclude every other reasonable hypothesis," including the one that he killed in self defense. People v. Willson, 401 Ill 68,

379

81 NE2d 485 (1948); People v. Ahrling, 279 Ill 70, 116 NE 764 (1917).

The statutory provisions relied upon by the defendant read as follows (c 38, § 3–2(a, (b), and § 7–14, Ill Rev Stats (1961)):

§ 3–2.   Affirmative Defense

(a)  "Affirmative defense" means that unless the State's evidence raised the issue involving the alleged defense, the defendant, to raise the issue, must present some evidence thereon.

(b)  If the issue involved in an affirmative defense is raised then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense.

§ 7–14.   Affirmative Defense

A defense of justifiable use of force, or of exoneration, based on the provisions of this Article is an affirmative defense.

■  It is apparent from the above, as well as the Committee Comments to the Criminal Code of 1961 thereunder, that once the issue of self defense is raised by some minimum amount of evidence which is sufficient to warrant submission of that issue to the jury, the affirmative defense becomes another element of the offense and the State has the burden of proving defendant guilty beyond a reasonable doubt as to that issue as well.

■ ■  However, in the instant case it is undisputed that defendant shot the deceased. Under such circumstances, it has been held that the burden to prove circumstances justifying, mitigating or excusing his action is on the defendant, unless it was sufficiently manifest from the proof of the State that he was justified or exonerated in committing the homicide. People v. Washington, 27 Ill2d 104, 187

380

NE2d 739 (1963); People v. Kelley, 29 Ill2d 53, 193 NE2d 21 (1964). The issue of self defense was raised by defendant's exculpatory statements, and was submitted to the jury. It was for them to determine where the truth lay and to ascertain the facts of this case. Upon full review of the evidence we cannot say the jury was unwarranted in rejecting defendant's claim of self defense, nor was the evidence palpably contrary to the verdict, or so unsatisfactory as to raise a reasonable doubt as to the issue of self defense or defendant's guilt.

█ Defendant's contention is without merit for the reason that it is based upon the false premise that the jury was bound to accept and believe his exculpatory statements. Where the defendant is the only person who supplies direct evidence as to the actual facts of the homicide, and for the purpose of establishing self defense, the authorities indicate the jury is not compelled to accept his statements. As stated in People v. Jordan, 4 Ill2d 155, 122 NE2d 209 (1954), at page 163, "(T)he jury may reject defendant's story if, in itself, it is so remarkable as to almost seem incredible if there were no contradictory evidence, (People v. Morris, 254 Ill 559, 573, 98 NE 975), or if the story of defendant was so improbable as to justify it in being disregarded by them, or if it was contradicted by the facts and circumstances shown in the record, (People v. Strause, 290 Ill 259, 278, 125 NE 339), or if defendant's story was so unreasonable as to be judged improbable. (People v. Meyers, 412 Ill 136, 145, 105 NE2d 746; People v. Uher, 375 Ill 499, 502, 31 NE2d 936.)"

The uncontradicted evidence indicates that the deceased was killed with defendant's gun; that after the killing, defendant left the deceased in the street, in an isolated area late at night, without attempting

■

to secure medical assistance; that he threw deceased's wallet away, and returned to Hickory Gardens Tavern in an attempt to establish that he had not been with the deceased; that he then hid his gun, and lied to the police regarding his part in the entire episode, and that when he finally gave his statements they were inconsistent. In his first statement, defendant said that Hardie's belligerent attitude was due to the fact that there was "no money, no tires, no car," while the second statement, for the first time, referred to Hardie becoming "salty" because defendant would not sell the "pills."

■ We believe the facts and circumstances are such that defendant's weak explanation of the deceased's possession of his gun; his flight from the scene of the killing; the inconsistencies in his own explanations, as well as his possible motive for the shooting raised serious doubts as to the probability of the truthfulness of his exculpatory statements. We cannot say that the jury wilfully and capriciously disregarded defendant's statement as to the start of the affray between himself and his victim. The requirement that defendant's guilt be proven beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it. The jury was not required to search out a series of potential explanations compatible with innocence, and elevate them to the status of reasonable doubt. People v. Russell, 17 Ill2d 328, 161 NE2d 309 (1959).

A case similar to the one at bar is that of People v. Skelly, 409 Ill 613, 100 NE2d 915. There, as here, defendant pleaded self defense, and contended upon review that the only evidence as to the affray between him and the deceased "when they met on the street, was his uncontradicted and unimpeached testimony that deceased attacked him in the mouth with

a pistol, that a scuffle ensued in which both fell to the pavement, that deceased had a pistol in his hand and that he, the defendant, shot deceased in fear of his life or of suffering great bodily harm; that there being no other direct evidence as to how the fight started, the court and jury were bound by his testimony and his plea of self defense was established." The Supreme Court affirmed the verdict of the jury, and sustained its findings that defendant's plea of self defense was unworthy of belief. And we so hold in this case. We find no basis for defendant's reliance on People v. Jordan, 4 Ill2d 155, 122 NE2d 209, since here, the People's case was sustained on evidence other than the mere rejection of defendant's exculpatory statements.

██ Defendant also contends that the trial court erred in refusing to instruct the jury that to establish defendant's guilt there must be "no reasonable theory upon which he can be innocent" and that guilt cannot be predicated it there is "any reasonable theory consistent with the innocence of the defendant." Without commenting on the People's argument that the alleged error in refusing the instructions was not preserved, since the written motion for new trial was solely confined to the sufficiency of the evidence, it is only necessary to note that the trial court allowed one prosecution instruction and four defense instructions which recited the presumption of innocence and the burden of proof beyond a reasonable doubt. Three defense instructions on self defense were also given. The jury was thoroughly and correctly instructed on the law applicable to the issues presented. Defendant's attempt to further define or elaborate upon the meaning of "reasonable doubt" was improper (People v. Davis, 406 Ill 215, 220, 92 NE2d 649 (1950)), and as the instructions were also repetitious and superfluous (People v. Rife, 382 Ill 588, 48 NE2d

367 (1943); People v. Weaver, 18 Ill2d 108, 163 NE 2d 483 (1959)), the trial court did not commit error in denying them.

For the foregoing reasons the conviction of defendant is affirmed.

Affirmed.

MURPHY, P. J. and BURMAN, J., concur.