(No. 32287.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROBERT MEYERS *et al.,* Plaintiffs in Error.

*Opinion filed March 20, 1952—Rehearing denied May 19, 1952.*

PAUL R. DURR, (C. C. WORTHY, of counsel,) both of Hardin, for plaintiffs in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and ERNEST G. UTTER, State's Attorney, of Rushville, (HARRY L. PATE, of Tuscola, of counsel,) for the People.

Mr. JUSTICE FULTON delivered the opinion of the court:

The plaintiffs in error, Robert Meyers and William Meford, together with one Charles Slone, were indicted by the grand jury of Schuyler County for the crimes of larceny and receiving stolen property. The indictment contained three counts, the first two charging larceny and the third charging the receiving of stolen property. Charles Slone sought a separate trial and his motion was allowed. He testified for the People at the trial of the other defendants. The defendants Meyers and Meford were tried before the circuit court of Schuyler County without a jury and were found guilty of the crime of larceny under count I of the indictment. The value of the property stolen was fixed by the court at $126.63. Motions for a new trial and in arrest of judgment were overruled and each defendant was sentenced to imprisonment in the Illinois State Penitentiary for a period of not less than three years nor more than eight years. The case is brought here upon writ of error seeking to reverse the judgment of conviction.

Since all of the points presented and argued by defendants relate to the legal sufficiency of the evidence, a brief review of the facts presented at the trial is necessary. The evidence on the part of the People shows that one Dana Breeden lives at Browning, in Schuyler County, where he conducts a wholesale and retail fish business. His business establishment is along the banks of the Illinois River. In connection with his business he maintains "live boxes" in

the river which are attached to steel tanks as floats. In these boxes live fish are kept until such time as they are sold. Breeden's place of business is located upon the banks of the river about two and one-half blocks from the main business section of Browning. Wilbert Moss, who is also engaged in the business of buying and selling fish in Browning, has an establishment which is not located on the banks of the river but he maintains live boxes in the river near those of Dana Breeden.

Breeden's testimony shows that on Christmas Day of 1950, and the day before, he had bought large amounts of fish from various fishermen. Among these were a considerable number of a species of catfish known as flatheads or goujon. About one thousand pounds of catfish, including the flatheads, were in his live box in the river on the afternoon of Christmas Day. Because he had been missing fish from time to time, Breeden, on Christmas Day in the presence of his son, Albert, marked several catfish by sewing heavy lemon colored twine in their mouths and under their jaws. One of the fish so marked was a yellow flathead or goujon weighing eight and one-half pounds. It had a large scar on either side of its body. Another of those marked was about the same size and still another weighed about three pounds. The marked fish were placed in the live box which contained the other catfish. Breeden last saw this live box containing the catfish at about 3:00 o'clock on Christmas afternoon. At that time it was securely attached by rope and wires to the floats in the river.

On the morning of December 26, at about 7:30 o'clock, Wilbert Moss went down to the river and discovered that one of his live boxes was missing. He also noticed that the lid on one of Breeden's boxes was open. Breeden came to his place of business shortly thereafter and Moss called Breeden's attention to the fact that one of his boxes was open. Upon going to the location of his floats, Breeden discovered that the ropes holding the live box containing

the one thousand pounds of catfish had been cut and the box and fish were gone. The lid of another box had been opened and a partition had been removed.

Several persons, including Wilbert Moss and Breeden's son, Albert, went down the river in a motorboat searching for the live boxes. Moss's box was never found. At a point near Fiddle Creek, about two miles below Browning, they found the Breeden live box on the bank of the river. The hasp under the lock had been pried up and bent and the box forced open. At a point near Sugar Creek, further down the river, a boat which belonged to Wilbert Moss was found drawn up on the bank. The boat was bloody inside and catfish tails were found frozen to the sides of the boat. On shore there was evidence of blood in the snow and the footprints of several persons. The searchers also found some tire marks from an automobile.

Defendants Meyers and Meford reside in Beardstown, which is about eight miles south of Browning on the opposite side of the Illinois River. On December 26, at about 9:00 o'clock in the morning, defendants appeared at the home of Charles Slone in Hamburg. Hamburg is about seventy miles southwest of Beardstown. The defendants told Slone they had some fish to sell and wanted him to help them dispose of them. Slone accompanied defendants to Kampsville, a town about ten miles northeast of Hamburg, where Meford got out. Meyers and Slone then proceeded in Meyers' car to Grafton, which is about thirty miles southeast of Kampsville. There, at the fish market of Homer and William DeSherlia, Meyers and Slone sold 603 pounds of catfish in the name of Slone for 21 cents per pound. The DeSherlias did not buy quite all of the fish which Meyers and Slone had with them. William DeSherlia made a check for $126.63 payable to Charles Slone, which Slone cashed at a tavern across the street from the market. Meyers and Slone then drove back to Kampsville where they found Meford in a tavern. Meyers

and Meford divided the proceeds of the check between them and each gave Slone two dollars which he testified was in the nature of a loan and as an advance against some net hooks he was to make for them.

DeSherlia sold 250 pounds of the fish he bought from Meyers and Slone to Marietta Raymond, who conducts a fish market at Alton. On December 27, Breeden, accompanied by the sheriff of Schuyler County and others, visited the DeSherlia market at Grafton and the Raymond market at Alton. At each of these markets Breeden picked out a fish from among those purchased from Meyers and Slone which had been marked with the heavy twine or string. One of these fish was a fish weighing about eight and one-half pounds with scars on its sides. These fish were set aside and preserved, and at the trial Breeden positively identified them as the fish he had marked and placed in the live box which was stolen. DeSherlia testified that the fish identified by Breeden at his market was from the group of fish purchased from Meyers and Slone. Both Meyers and Meford testified that they had no flathead catfish whatever among the fish they sold but DeSherlia testified that there were a number of flatheads in the batch, and Mrs. Raymond testified that there were a number of flatheads among the 250 pounds sold by DeSherlia to her. Both fish identified by Breeden at the trial were of the latter variety.

Defendants Meyers and Meford testified that the fish they sold had been caught by them in a seine on Christmas afternoon near Beardstown. Both testified they were commercial fishermen and had been fishing together since September 1, 1950. Each testified that after making a haul, which consisted entirely of channel catfish, on Christmas afternoon, they proceeded to the home of Robert Meyers in Beardstown, at about 5:00 o'clock. Several witnesses testified for the defendants that at about this time they saw fish behind the front seat of Robert Meyers' car but none testified as to what amount of fish was there. Meyers

and Meford both testified that Meford stopped at the Meyers' home until about 6:00 o'clock, after which Meford went to his own home for supper. At about 7:00 o'clock Meyers called for Meford in his car and together they went in Meyers' car to a certain filling station where they obtained gasoline and brake fluid. The station attendant identified them as having been at his station about 7:00 o'clock in the evening. Meyers then took Meford home and returned to his own home. Meyers lay down on the davenport in his living room to sleep, asking his sister to wake him at 11:00 o'clock. His sister wakened him shortly before 11:00 o'clock and Meyers left his home at once. Meyers and Meford both testified that Meyers called for Meford immediately thereafter; that Meyers had the fish they had caught in the back of his car and that they proceeded in a southerly direction from Beardstown and stopped at a restaurant and filling station and had coffee. This restaurant is about 29 miles south of Beardstown. The proprietor testified they were in his place of business between 12:00 o'clock midnight and 1:00 o'clock A.M. The proprietor was the last person who saw defendants prior to their appearance at the home of Charles Slone at 9:00 o'clock on the morning of December 26.

The defendants testified that after leaving the restaurant they proceeded about 41 miles south to Hardin, where they called upon William Meford's grandmother, Mrs. Otto Lawson, at 3:00 or 3:30 o'clock in the morning. Mrs. Lawson did not testify at the trial. Meford testified he told his grandmother they were there to get a truck belonging to his father. According to defendants' story they waited at Hardin until a gasoline station opened at 7:00 o'clock, to buy a battery for the truck. While at Hardin they conceived the idea of getting Charles Slone to sell the fish for them, so they took both Meyers' car and the truck back north to Kampsville where they left the truck and proceeded to Charles Slone's residence in Meyers' car.

Meyers testified that he had some sort of trouble with Homer DeSherlia and, therefore, could not deal with him directly. Defendants testified that the usual markets to which they sold fish were not open to them because they had been advised that no fish would be needed until after the holidays. When asked why they had gone fishing on Christmas Day in view of this situation, Meford replied that it was because the river was open. When asked why they set forth at 11:00 o'clock on Christmas night to sell the fish, Meford testified it was because they were broke and needed the money. Meyers had previously testified that he was a river pilot for the Alton barge lines at a salary of $675 per month and both had testified to making big catches of fish all during the fall and early winter. The explanation given for taking the fish approximately ninety miles to Grafton to sell them was twofold, first, that no one closer would buy from them, and, second, the hope of getting more money.

The first error assigned and argued is that venue was not proved. Counsel for the People argue that this question was not properly preserved at the trial and cannot be presented here. We think it unnecessary to pass upon the latter contention because we find in the record ample evidence that the property in question was stolen in Schuyler County as alleged in the indictment. The testimony of at least three witnesses has repeated references to the locale of the crime. Dana Breeden testified that he lives at Browning; that Browning is in Schuyler County, and that he conducts a wholesale and retail fish business at Browning. At another point in his testimony he stated that the live box in question was tied to steel tanks and was floating in the river near Browning in Schuyler County. He also testified that this was the point from which the box disappeared. Albert Breeden testified that he went down the river and located the live box that had been taken from his father's market at Browning, in Schuyler County.

He also testified, at the instance of defense counsel on cross-examination, that both the location near Fiddle Creek where the box was found and the location near Sugar Creek where the boat was found were in Schuyler County. Wilbert Moss described particularly the location of the Breeden market in Browning as well as its live boxes and floats and stated the location as being in Schuyler County. By competent and sufficient evidence the venue was proved beyond a reasonable doubt.

Defendants' counsel contends that the two fish received in evidence at the trial should not have been admitted and that the court erred in so doing. He cites no authority to support his position. At the trial the objection to their admission was the general objection that they were incompetent, irrelevant and immaterial and that they had not been properly identified. Counsel for the People contend that this question cannot be raised here since the abstract of record filed by defendants fails to show the making of any objection to the admission of these exhibits. The position taken by counsel for the People in this regard is probably correct, but, under the view we take of the evidence, it is not necessary to pass upon this contention. Breeden testified positively as to marking these fish with the twine, and his son saw him do it. DeSherlia testified positively that there were flathead catfish among those sold to him by Meyers and Slone and that the one picked out by Breeden later at DeSherlia's place of business was from among the fish he purchased from Meyers and Slone. Mrs. Raymond also testified that the fish picked out by Breeden at her place had a string in its mouth and was from the 250 pounds of fish sold to her by DeSherlia. DeSherlia had previously testified that on December 26 he sold 250 pounds of the fish bought from Meyers and Slone to Mrs. Raymond. Finally, at the trial, Breeden identified both fish as fish he had marked and put in his live box on Christmas Day. He pointed out the string still

in the mouth of each and the scars on one of the fish. Albert Thompson, a deputy sheriff of Schuyler County, testified that from the time of their recovery the fish had been preserved in the Schuyler locker plant and that they were in the same condition as when recovered. In view of this testimony, the fish were properly identified and connected with defendants. These exhibits were competent and the evidence was relevant to the issues, especially in view of the testimony of the defendants that they had caught and sold only channel catfish and that there were no flatheads among them.

Defendants finally contend that the evidence, taken as a whole, does not establish their guilt beyond a reasonable doubt. We have set forth the evidence in considerable detail. It is unnecessary to repeat what has already been said. The evidence as above related was certainly such that the trial court was justified in finding the defendants guilty. The mere fact that the evidence is conflicting does not furnish any basis for a reversal nor will such a conflict cause this court to substitute its judgment for that of the jury or trial court. *People* v. *Smith*, 391 Ill. 172; *People* v. *Hinderhan*, 405 Ill. 435.

The clear and convincing character of the evidence for the People stands in sharp contrast with the unsatisfactory nature of the evidence produced by the defendants. Defendants sought to establish an alibi and at the same time to account for the large amount of fish offered by them for sale, yet no one who testified could say that they saw the defendants during the period from 1:00 o'clock A.M. to 9:00 o'clock A.M. on December 26, the period of time during which Breeden's fish were probably stolen. No satisfactory explanation was ever given why defendants had to be on the road all night to sell the fish or why they were unable to deal with markets close at hand. Several persons testified that defendant Meyers had fish in the back seat of his car at about 5:00 o'clock P.M. on Decem-

ber 25, but there was no testimony as to the amount of fish, and, even though it be conceded that Meyers and Meford may have caught some fish on Christmas afternoon, there is no proof in the record except their own testimony and the testimony of Meford's brother that the fish caught were of any considerable amount. Defendants both testified that they were fishermen and as such they were likely to have some fish on hand at almost any time. We realize that the defendants had no burden of proving their innocence, but when they elected to explain their possession and sale of fish in the manner undertaken, it was incumbent upon them to tell a reasonable story or to be judged by its improbabilities.

From a careful examination of the entire record, we believe the evidence establishes the guilt of the defendants beyond a reasonable doubt. The judgment of the circuit court of Schuyler County is correct and is affirmed.

*Judgment affirmed.*