The People of the State of Illinois, Plaintiff-Appellee, *v.* Bradley Greene, Defendant-Appellant.

(No. 58020;

First District (2nd Division)—April 22, 1975.

*Rehearing denied May 15, 1975.*

Jo-Anne F. Wolfson, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, Mariann Twist and John C. O'Rourke, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

On the morning of 19 June 1970 at about 1:25 A.M., Chicago Police Officer Kenneth Kaner was shot to death while sitting in his police car at the corner of 74th Street (7400 south) and Union Avenue (700 west). A few minutes later, a car in which Bradley Greene, Bruce Sharp, Dwight Cavin, William Redwine, and Jerome Amos were riding, was stopped by police officers, patrolling in an unmarked car, between 71st and 72nd Streets on Union Avenue headed north. The reason for the stop was that the car had neither license plates nor a tail reflector. A routine inspection of the car, prompted by the fact that one of the officers saw an open quart of beer on the floor of the auto, disclosed three weapons, including one which turned out to be Officer Kaner's service revolver.

Following the arrests of the five individuals, both Sharp and Cavin gave statements in which they admitted their parts in the shooting. Neither the statement by Sharp nor the three statements given by Cavin specifically implicated Greene.

The defendant Greene and the other four persons were indicted in three counts for the offense of murder:[1] one count charging "* * * in that they, intentionally and knowingly shot and killed Officer Kenneth Kaner with a shotgun without lawful justification"; the second count charging that "* * * they, shot and killed Officer Kenneth Kaner with a shotgun, knowing that such shooting with a shotgun created a strong probability of death or great bodily harm to said Officer Kenneth Kaner without lawful justification"; the third count charging that "* * * they, while committing a forcible felony, to wit: armed robbery shot and killed

---

[1] Ill. Rev. Stat. 1969, ch. 38, par. 9—1.

Officer Kenneth Kaner." They were also indicted on one count for armed robbery [2] and on one count for the unlawful use of weapons.[3]

The trials of Sharp and Cavin were severed from the trials of Greene, Redwine,[4] and Amos. The latter three codefendants waived a jury trial.

At the bench trial, the first witness called by the State was Willis Bulliner who resided at 7358 S. Union (the northwest corner of Union and 74th Street). He testified that at about 1:25 or 1:30 A.M. on 19 June 1970, he heard two shots, one a loud blast, the other a sharp report. Right after the shots the witness heard a car door slam shut and then heard someone running. Looking out his window, the witness saw a police car, and then told his wife to call the police. The car had its interior lights on, and the witness saw the officer lying in the car. The witness went to the car and saw a large hole in the door window and the officer lying on the front seat, driver's side, on the side of his face, dead.

Photographic evidence revealed the police car to be located along the curb relatively close to and directly below the apartment of witness Bulliner. The parties stipulated a telephone message "Police Officer shot, 74th and Union" was received at 1:29 A.M. on 19 June 1970 at the communication center of the Chicago Police Department.

The next witness to testify was Chicago Police Officer Edward Brown. At the time of the incident, the witness was with his partner, Carl Malek, on patrol proceeding in an unmarked squad car eastbound on 72nd Street in the vicinity of South Halsted Street (800 west). At approximately 1:28 A.M., they saw a Chevy Corvair with no license plates or tail reflectors. The Corvair was proceeding east on 72nd Street, just east of Halsted Street,[5] and then turned left on Union heading north. The officer's partner turned on the oscillating headlights. Three occupants in the rear of the Corvair turned around and looked back at the squad car. The car stopped, moved forward for a short distance, and then came to a complete stop in the middle of the block.

Brown testified that there were five individuals in the car. After stopping, the front-seat passenger and the driver of the car got out of the car simultaneously, each on his respective side of the car. The front-seat passenger, Redwine, put his hands up in the air. The driver, Bradley Greene, did nothing out of the ordinary. Greene just got out of the car

---

[2] Ill. Rev. Stat. 1969, ch. 38, par. 18—2.

[3] Ill. Rev. Stat. 1969, ch. 38, par. 24—1.

[4] The conviction of codefendant William T. Redwine was affirmed by this court. 19 Ill.App.3d 721, 312 N.E.2d 297.

[5] The streets pertinent to this testimony east from Halsted are Emerald, Union, and Lowe.

and looked back at the squad car. Neither the witness nor his partner had their guns drawn at this time. Greene was instructed to go to the rear of the car. A license-applied-for sticker indicated that the car was registered to William Redwine. As the witness was walking to the rear of the car, he looked in the window and saw an open quart of beer lying on the floor. The bottle was three-quarters full and was on the front passenger's side of the car.

As the witness opened the door to get the bottle of beer, his attention was drawn to the back seat where he saw the butt of a gun sticking up between the feet of one of the defendants, Dwight Cavin. The witness grabbed the gun out of the back of the car. The gun was a .38-caliber Colt (later determined to be Officer Kaner's service revolver). The witness took it for granted that the gun was loaded and held it on the three people in the back seat of the car and told them to step out of the car. Bruce Sharp was sitting behind the driver's seat, Dwight Cavin was in the middle, and Jerome Amos was sitting on the passenger side in the rear.

After all of the individuals were out of the car, the witness pulled the back of the driver's seat forward and looked down in the bottom of the car where he saw a couple of shotgun shells on the floor. There were shotgun shells on the back seat also. In addition, the witness observed the stock of a sawed-off shotgun sticking out 2 or 3 inches from under the front passenger's seat. The witness proceeded to unload the weapon. There was one spent cartridge in it and one live round. The officer smelled the spent cartridge; it had a fresh burnt-powder smell.

Shortly thereafter, another police car, manned by Officer Frederick Cowan, arrived on the scene from the north. Prior to this, the witness had not been aware of the shooting of Officer Kaner. The witness further testified that Officer Cowan searched the five individuals, and that Officer Malek searched the car further and found a .38-caliber Smith and Wesson revolver underneath the rear of the driver's seat. Brown described the car as a two-door, '63 Corvair with engine in the rear.

The testimony of Officer Brown's partner, Officer Carl Malek, was substantially similar to that of Officer Brown except that Malek testified to having observed Greene, when the officers first observed the Corvair eastbound on 72nd Street, get out of the passenger side of the vehicle, walk around the back of the vehicle, and get into the driver's side. In addition, Malek testified that he found shotgun shells in the glove compartment of the Corvair.

The testimony of Officer Cowan was consistent with that of Officers Brown and Malek as to the search of the vehicle and his search of the

five individuals following his arrival on the scene. The witness found shotgun shells on defendant Sharp.

Thereafter, various lab technicians testified, or their testimony was stipulated to, that Officer Kaner was shot once by lead pellets fired from a shotgun, and once by a bullet from a .38-caliber Smith and Wesson; that the cause of death was a shotgun blast to the head; and that a fingerprint of defendant Amos appeared on the trigger of Officer Kaner's service revolver.

At this point the State rested its case. Defendants Greene and Redwine rested. Amos, however, indicated he was going to proceed with his defense. Greene's attorney repeatedly disclaimed anything that followed the resting of Greene's case, contending that as far as Greene was concerned, the trial was over. The trial court agreed that the evidence was closed as to Greene. Redwine, however, later withdrew his motion to rest.

On 15 September 1970, Greene and Redwine were found guilty as charged, while Amos was found not guilty. On 20 November 1970, Greene filed a motion for a new trial and, in the alternative, a motion that the court reconsider the evidence. Both alternative motions were denied. Greene then called seven mitigation witnesses who detailed his academic career and his success as a teacher, and who expressed their support for him.

On 16 February 1971, Greene filed a renewed motion for reconsideration of the evidence, and, in the alternative, a motion for a new trial based on newly discovered evidence. The court treated these alternative motions as a motion to vacate the finding of guilty and to reopen the evidence and allowed the motion. The additional evidence was the testimony of Sharp and that of Greene in his own behalf.

Bruce Sharp testified on behalf of Green that on 18 June 1970 he had played basketball from about 6 P.M. until dark with Greene, Redwine, Cavin, and Amos. While they were playing, the witness was drinking alcohol. After the game, the witness, Greene, Redwine, Cavin, and Amos went to 95th Street in Redwine's car. Redwine was driving; Greene was in the front passenger seat; and the witness was in the back seat behind Greene. The witness did not remember where Amos and Cavin were. The witness was drinking an alcoholic beverage and smoking marijuana.

When they arrived at a housing project on 95th Street, the witness and Cavin left the car. The witness walked a short distance with Cavin and then Cavin continued on. When Cavin returned, he had a sawed-off shotgun with him. The witness took the shotgun and put it under his jacket. When Sharp and Cavin got back to the car, Redwine and Greene were still in the front seat. Redwine was still in the driver's seat. The wit-

ness had no conversation in the presence of Greene about the sawed-off shotgun. Furthermore, prior to getting out of the car, he had not had a conversation in the presence of Greene about the gun.

From 95th Street they were going to take Amos home at 64th and Lowe (632 west). Bradley Greene left the car around 73rd Street for a short time to relieve himself. While Greene was out of the car, a policeman came up to the car. Greene came back after the policeman had left. They continued on with Redwine still driving. The witness (Sharp) then saw a police car, told Redwine to stop, and got out of the car. Redwine and Cavin also got out of the car. They went to the squad car and shot the policeman. When the witness and Redwine returned to the Corvair, Greene was driving.

When the witness told Redwine to stop the car, the witness said nothing to Redwine, Greene, Amos or Cavin about going to kill a police officer. Neither did he say anything in the presence of Greene about going to take the policeman's gun away from him. When he returned to the car, he said nothing to Amos, Greene, Cavin, or Redwine about shooting a police officer. He said nothing about having stolen a policeman's gun. To his knowledge, Greene did not hear a single word about shooting a police officer or taking a police officer's gun.

On cross-examination, the witness admitted having given a statement to an assistant State's attorney. One of the questions asked in that statement was:

"Q. When did you first come into possession of that gun, was it in the car that evening or had—

A. In the car that evening."

But the witness then repeated his testimony on direct examination that he had first come into possession of the shotgun on the street.

Another question which had been asked in that statement was:

"Q. Would you tell me in your own words what happened relative to the shooting that took place at this particular squad car?

A. Like I said, we had been drinking and we saw the squad car and I don't know, I guess we just said like why, let's go get him, something like that, like we wasn't thinking right, so we jumped out of the car."

But the witness then denied that anybody had said, "let's go get him." [6]

The witness stated that he did not converse with Greene at any time when the witness left the car. After shooting the officer, the witness ran down an alley with Redwine behind him and was picked up by the car

---

[6] The foregoing was for impeachment purposes and is not substantive evidence.

with Greene driving about a block and a half from where the officer was shot. The witness stated the shot that hit the police officer made a rather loud noise.

In his testimony, Bradley Greene testified to playing basketball and then riding in the car with Sharp, Cavin, Redwine, and Amos from the basketball court to the housing project on 95th Street. Before Sharp and Cavin got out of the car, there was no conversation about guns, and when they returned to the car, he did not see any guns in their possession, nor was there any conversation about guns. The witness did not see any guns prior to arriving at 95th Street. Neither did anybody go into the glove compartment in his presence. They started for Amos' house. On the way, the witness relieved himself under a viaduct at 73rd and Lowe.[7] When he returned to the car, he saw a police officer outside the car. The witness talked to the policeman. After doing so, the witness got in the car and Redwine started to drive around. As they were driving around, Sharp said, "Stop the car," and Redwine did so. Sharp did not say anything about shooting a policeman. Sharp, Cavin, and Redwine got out of the car. The witness did not see where they went. They were gone 5 to 10 minutes. The witness slid over into the driver's seat and turned up the radio.

Cavin came back to the car first and told the witness to drive. Cavin said nothing about where he had been. The witness then drove the car from where it was parked heading north on Emerald Avenue (732 west) between 73rd and 74th Streets, turned the corner, saw Redwine and Sharp, and picked them up. After all were back in the car, nothing was said about guns or policemen. The three that had left the car did not say where they had been. The witness stated that it was not unusual for Sharp, Cavin, or Redwine not to say anything. He did not want to "bug" them because they had been drinking and smoking marijuana. After driving for about a minute, the witness noticed some flashing lights behind him and stopped the car.

After hearing the testimony of Sharp and Greene, the court found Greene guilty as charged and sentenced him to 15-50 years in prison. We are concerned only with the appeal of Greene. As noted Redwine took a separate appeal in which his conviction was affirmed.

On appeal defendant challenges the finding of guilty because of the circumstantial evidence, because of the legal accountability theory, and because there was a reasonable doubt of guilt. Defendant further asks whether the court's action in vacating the finding of guilty to reopen

---

[7] This was not more than two blocks from where Officer Kaner was shot.

proof 5 months after the trial was indicative of reasonable doubt of defendant's guilt.

## I.

■■ The paramount issue in this appeal is whether the State proved the defendant guilty beyond a reasonable doubt. The cases are legion which state and restate the cardinal principle that the State must establish beyond a reasonable doubt all the essential elements necessary to constitute the crime charged, and the guilt of the accused. We commence then by restating a few basic concepts as set forth in *People v. Coulson* (1958), 13 Ill.2d 290, 296, 149 N.E.2d 96:

> "[I]t is always the duty of this court to examine the evidence in a criminal case, and if it is so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt the conviction will be reversed. [Citations.] A judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of the guilt of the defendant, and it is the insufficiency of the People's evidence which creates such doubt. If a conviction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the defendant's case." 13 Ill.2d 290, 296.

In the instant case the State must prove the fact of death of Officer Kaner and the criminal agency of another as the cause of death. There is no dispute that Officer Kaner was shot once by lead pellets fired from a shotgun and once by a bullet from a .38-caliber Smith and Wesson; that the cause of death was a shotgun blast to the head; and that Kaner's .38-caliber gun, along with several shotgun shells, and a sawed-off shotgun, which the State's evidence proved capable of firing the whole of a certain fragment recovered from Kaner's head, were found less than five minutes after, and a few blocks away from, the shooting. Furthermore, there is no dispute that the defendant was driving the two-door Corvair in which the other four defendants, the guns, and the shotgun were found when stopped by the police.

There is likewise no dispute that in the State's case no evidence was presented indicating who fired the shots that caused the death of Kaner. Therefore, in order to attempt to establish the criminal agency of the defendant, the State relied upon two legally recognized theories: (1) circumstantial evidence and (2) accountability.

Where there is no direct testimony of a criminal act, a conviction can be sustained upon circumstantial evidence. *People v. Hansen* (1955), 5 Ill.2d 535, 540, 126 N.E.2d 243; *People v. Brown* (1963), 27 Ill.2d 23, 187 N.E.2d 728, *cert. denied*, 374 U.S. 854; 14A I.L.P. *Criminal Law* § 433.

■ It is equally fundamental when a prosecution, as here, rests completely on circumstantial evidence, the circumstantial evidence must so thoroughly establish the accused's guilt as to exclude every other reasonable hypothesis. (*People v. Lewellen* (1969), 43 Ill.2d 74, 78, 250 N.E.2d 651; *People v. Dougard* (1959), 16 Ill.2d 603, 158 N.E.2d 596.) In a circumstantial evidence case it is equally true that the triers of fact are not required to search out a series of potential explanations compatible with innocence and elevate them to the status of reasonable doubt. *People v. Huff* (1963), 29 Ill.2d 315, 320, 194 N.E.2d 230.

With these principles in mind, let us now turn to the question of "accountability." Section 5—2 of the applicable Criminal Code (Ill. Rev. Stat. 1969, ch. 38, par. 5—2.) provides, so far as pertinent:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. However, a person is not so accountable, unless the statute defining the offense provides otherwise, if:

\* \* \*

(3) Before the commission of the offense, he terminates his effort to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to prevent the commission of the offense."

Recently our supreme court in *People v. Robinson* (1974), 59 Ill.2d 184, 319 N.E.2d 772, reviewed the theory of accountability, the test as to when one is an accomplice, and the question of mere presence or negative acquiescence. See *Robinson*, at 190-192.

■■ In *People v. Richardson* (1965), 32 Ill.2d 472, 476, 207 N.E.2d 478, *cert. denied*, 384 U.S. 1024, *rehearing denied*, 385 U.S. 889, our supreme court stated that proof of a common purpose need not be supported by words of agreement but can be drawn from the circumstances surrounding the commission of an act by a group. The opinion went on with this appropriate quote:

" 'While mere presence or negative acquiescence is not sufficient to constitute a person a principal to a crime, one may aid and abet, without actively participating in the overt act, and if the proof shows he was present at the crime without disapproving or op-

posing it, the trier of fact may competently consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the criminal act, lent his countenance and approval and was thereby aiding and abetting the crime. (*People v. Washington*, 26 Ill.2d 207; *People v. Thicksten*, 14 Ill.2d 132.).' (30 Ill.2d at 72.)" 32 Ill.2d 472, 477.

With these principles in mind, first let us now look at and evaluate the State's evidence. As previously noted, that evidence indicated that, at approximately 1:25 to 1:30 A.M. on 19 June 1970, Officer Kaner was shot to death in a police car which was parked at the corner of 74th and Union Streets—two shots were heard in a nearby apartment by a person listening to television; that at approximately 1:29 A.M. the city central police communication center received a call that a police officer was shot; that at approximately 1:28 A.M. a two-door, 1963 Chevy Corvair was seen on 72nd Street, just east of Halsted Street; [8] that when the two-door Corvair stopped, the defendant existed from the driver's side, codefendant Redwine exited from the passenger side and the three other defendants were in the back seat; that three guns were found in the car as follows: Officer Kaner's .38-caliber Colt revolver between the legs of defendant Cavin on the back seat floor, a .38-caliber Smith and Wesson under the driver's seat, and a sawed-off shotgun with one spent cartridge which had a fresh burnt smell under the front passenger's seat; and that numerous shotgun shells were on the back-seat floor, on the back seat, and in the glove compartment.

With this strong circumstantial evidence, with defendant Greene driving the car in which Officer Kaner's service revolver was located, this short distance away and within less than 2 to 3 minutes after Kaner's body was found with a bullet and shotgun wound in a police car which had a side window smashed, the trial court, in our opinion, had ample evidence to conclude that the defendant was guilty of the charges in the indictment, either as a principal or accessory.

A comment with respect to the manner in which the case was tried is now appropriate. As previously noted, defendants Greene, Redwine, and Amos were jointly tried by the court. Upon the State resting, defendant Greene's attorney immediately said: "Your honor, at this time the defendant Green [*sic*] rests. And would ask, I am prepared to argue at this time"; and later "* * * I wish at this time to specifically disclaim any further matters that come up in the trial of this cause. The defendant

---

[8] A distance of approximately two to three blocks from the location of Officer Kaner's shooting.

Green · [*sic*] having rested." ·Defendant Redwine .also rested; however, he did so after joining with defendant Amos. in· a motion for a finding of not guilty· at the close of the State's case, which was denied. Defendant Amos then testified and presented two other witnesses. Thereafter, the State called one rebuttal witness.· After closing arguments, the trial court found · the· defendant Greene and codefendant Redwine guilty· and co-defendant Amos not guilty.

Thus, our first concern is whether, · under the principles of circumstantial· evidence and accountability, we ·think the evidence presented by the State does support the finding that Greene was guilty beyond a reasonable doubt of participating in· the ·offenses charged either as a principal or as an aider and abettor of the felony-murder and armed robbery of Officer Kaner ·and of the unlawful use of weapons charge.

· The State's evidence conclusively established that Greene was driving the Corvair within two minutes after a homicide had been committed; that there is ·evidence Greene was seen moving from the passenger to the driver's :side of· a· two-door Corvair, which car was first seen not more than two blocks from the scene of the incident and which car had within it, particularly secreted, Officer Kaner's service revolver plus two .other weapons with shotgun shells and a spent cartridge having a fresh burnt smell;· and that Officer Kaner was shot once by a shotgun and once by a .38-caliber Smith and Wesson, both types of gun found in the two-door Corvair. Thus, the trial court· did properly conclude that Greene participated in and actively aided and· abetted the commission of the crimes herein.

However, before sentencing [9] and some weeks after defendant was found guilty, and as the result of··defendant's post-verdict motions, the trial court vacated Greene's finding of guilty and reopened the evidence. Thereupon defendant called ·as a witness Bruce Sharp [10] and also Greene. Thereafter the trial court again found · Greene guilty as charged and stated, "I find the testimony of Sharp and Greene to ·be unreasonable and unbelievable  *  * ·*."

· Defendant now urges· that the thrust of the testimony of Sharp and the defendant was· that the defendant "neither participated in, nor in any way ·assisted, ·nor· had any awareness of the ·shooting· of decedent, or the taking of his service revolver." It is precisely this thrust of their testi-

---

[9] The· trial court, after finding Greene guilty. and before granting the ,post-verdict motions, conducted a hearing in aggravation and mitigation as referred to on page 5 of this opinion.

[10] Bruce Sharp, at. the time of testifying, had previously entered a plea of guilty and been sentenced.

mony which the trial court found "unreasonable and unbelievable."

In *People v. Jordan* (1954), 4 Ill.2d 155, 156, 163, 122 N.E.2d 209, the supreme court stated that a reviewing court, in examining the record where a guilty finding is made by a court where a jury has been waived, must carefully consider the evidence and reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged. (See also *People v. Lewellen* (1969), 43 Ill.2d 74, 78, 250 N.E.2d 651.) As stated in *Jordan,* the trier of fact may reject a defendant's story if it is incredible, so improbable as to justify its being disregarded, or so unreasonable as to be judged improbable.

In *People v. Spagnolia* (1961), 21 Ill.2d 455, 458, 173 N.E.2d 431, our supreme court said:

> "We have often held that when 'a defendant elects to justify or explain his presence at or near the scene of a crime, while denying participation, he must tell a reasonable story or be judged by its improbabilities.' (*People v. Lobb,* 17 Ill.2d 287, 294; see also *People v. Malmenato,* 14 Ill.2d 52, 60; *People v. Meyers,* 412 Ill. 136, 145.) Here the defendant was present at the scene of the crime. The trial judge saw the witnesses and heard them testify and in our opinion he was justified in finding that the defendant's guilt was proved beyond a reasonable doubt."

The evidence in its totality here is that on a summer night (19 June 1970) the five men after playing basketball entered a two-door Corvair, which the photographic evidence illustrates is not a large vehicle; that at all times thereafter the defendant was in the front seat either on the passenger side or as the driver; that at one point two defendants, then in the back seat, exited the car, obviously requiring someone in the front seat to allow them to get out; that Cavin returned with a sawed-off shotgun; that the parties then proceeded northward on the way to codefendant Amos' home at 64th and Lowe Streets; that on the way Greene exited the car at 73rd and Lowe Streets, at which time a Chicago police officer talked to the men including Greene as he returned to the car; then, instead of continuing on directly northward on Lowe Street to Amos' home (and this court can take judicial notice[11] that Lowe Street is at that point a through street), the men proceeded back one block south and one block west where Officer Kaner was stopped on the corner in a marked City of Chicago police car; that three of the codefendants exited from this two-

---

[11] This court can take judicial notice of well known geographical facts. *People v. Taylor* (1st Dist. 1970), 121 Ill.App.2d 403, 409, 257 N.E.2d 524, *reversed on other grounds,* 48 Ill.2d 91, 268 N.E.2d 865.

door car with a sawed-off shotgun and a .38 revolver; that Greene and one other codefendant remained in the car; that two loud shots rang out in the early morning causing a neighbor, in his nearby apartment, to hear the shots while listening to a television program; that thereafter the three men reentered the car with the same two guns and now with Officer Kaner's revolver; and that defendant Greene then became the driver. Greene would have us believe that during this time he did not see guns or shotgun shells, nor was there any conversation between the men in his presence about these guns and shells, or why the men stopped and exited the car or as to what happened after they reentered the car, nor did he hear any shots. Yet, somehow the two-door Corvair then started up, with Redwine, the previous driver, absent, and somehow proceeded to, and did, pick up Sharp and Redwine. But Greene says he neither saw or heard anything. We find it improbable that the triggermen would rely upon an "innocent," "unaware" occupant to act as a "get-away" driver.

As stated in *People v. Brown*, 27 Ill.2d 23, 26: "[t]he trier of fact need not disregard the inferences that flow normally from the evidence before it." Likewise, it has been repeatedly held that the trier of fact is not required to park his common sense at the courtroom door. Consequently, we believe the trial court was justified in concluding that, as to what defendant himself describes as the thrust of their testimony, "I find the testimony of Sharp and Greene to be unreasonable and unbelievable * * *."

■■ We think that the evidence presented by the State, when complemented by many of the additional circumstances related by Sharp and defendant and included in our immediately foregoing summary of the evidence in its totality, afforded an even stronger positive basis for the inference drawn by the trier of fact that defendant participated in the shooting and armed robbery of Officer Kaner so as to be legally accountable therefor. On review, we cannot disturb inferences drawn by the trier of fact when they are based upon and supported by the evidence.

In our opinion the evidence is strong and convincing that defendant Greene was present at the shooting of Officer Kaner; that he actively was aiding and abetting in the commission of the offenses charged; and that there is no scintilla of evidence to indicate he disapproved or opposed any of the acts charged in the indictment.

The defendant suggests that because the trial court found codefendant Amos not guilty, it was inconsistent to find the defendant guilty and relies upon *People v. Ethridge* (1st Dist. 1971), 131 Ill.App.2d 351, 268 N.E.2d 260. This court noted in *Ethridge* that the trial court stated no reasons for different findings as to two defendants when the State relied upon the same witnesses' testimony, and that it was error to reject their

testimony as to one defendant and find him guilty, while accepting the same testimony and finding the other defendant not guilty. But, that is not the situation here. As we have noted, Greene was actively participating by driving the car, whereas Amos in the back seat testified he was asleep and explained a fingerprint on one of the weapons by claiming that he pushed the gun away after he was awakened when the police stopped the car.

■■ Where, as here, there is a difference in the evidence before the trier of fact, a verdict of not guilty as to one codefendant does not warrant a reversal of defendant Greene's conviction. See *People v. Rogers* (1959), 16 Ill.2d 175, 157 N.E.2d 28; *People v. Fort* (1st Dist. 1971), 133 Ill.App. 2d 473, 273 N.E.2d 439; *People v. Spears* (2nd Dist. 1969), 106 Ill.App.2d 430, 245 N.E.2d 544.

## II.

The defendant also urges that the court erred in vacating the original finding of guilt some months after the original finding of guilty had been entered and post-trial motions had been denied.

The action now complained of followed certain motions of the defendant after these events:

| | |
|---|---|
| 15 September 1970 | Greene found guilty. |
| 20 November 1970 | Greene's post-trial motion denied, and witnesses in mitigation heard on behalf of Greene. |
| 29 January 1971 | Codefendant Sharp entered a plea of guilty and was sentenced. |
| 16 February 1971 | Greene renewed his original post-trial motion and, in the alternative, moved for a new trial based on newly discovered evidence of Sharp. |
| 18 February 1971 | Trial court advised Greene he could either reopen his case and call Sharp as a witness or stand on his motions. Defendant Greene accepted suggestion of court to reopen the case. |
| 19 February 1971 | The following colloquy took place: |

"THE COURT: Yes, no question about it. I was just talking about the mechanics of how we are proceeding right now.

What I will do is I will—you have a motion to vacate the finding of guilty, is that right?

MRS. WOLFSON: Yes, your honor.

THE COURT: Motion defendant Green [*sic*] to vacate finding of guilty sustained. Motion defendant to reopen the evidence is sustained. Is that right?

MRS. WOLFSON: Yes.

THE COURT: All right."

Thereupon, as previously discussed in this opinion, the defendant Greene and codefendant Sharp testified.

■■ Having received the benefit of the defendant's motions of 16 February 1971 by calling as witnesses Sharp and Greene, and although defendant Greene made no objection to the vacating of the finding of guilty, as we understand defendant now, the trial court somehow was in error. Yet had the court refused to allow the defendant to call Sharp and himself, he would now be urging error for that reason. We find no merit on this point.

For the reasons set out herein, the judgments of the circuit court of Cook County are affirmed.

Judgment affirmed.

DOWNING, P. J., and STAMOS, J., concur.